26 P.3d 40

STATE of Idaho, Plaintiff–Respondent,

v.

Ted Carl FEE, Defendant–Appellant.

No. 25925.

Court of Appeals of Idaho.

Jan. 30, 2001.

Review Denied June 22, 2001.

Ronaldo A. Coulter, State Appellate Public Defender; Charles I. Wadams, Deputy Appellate Public Defender, Boise, for appellant. Charles I. Wadams argued.

Hon. Alan G. Lance, Attorney General; T. Paul Krueger II, Deputy Attorney General, Boise, for respondent. T. Paul Krueger II argued.

SCHWARTZMAN, Chief Judge.

Ted Carl Fee appeals from the district court's denial of his motion to suppress evidence of methamphetamine manufacturing discovered in his mobile home without a search warrant and from his sentence of fifteen years' imprisonment, with five years fixed. We affirm.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 20, 1999, the Boise City Police Department received a Crime Stoppers report indicating that Fee was operating a methamphetamine lab in his brown double-wide mobile home at Pierce Park # 10. The Crime Stoppers tipster alleged that Fee resided in the mobile home with his wife and ten-year-old son and that another couple was teaching Fee how to manufacture methamphetamine. A warrants check revealed that Fee was currently wanted on a bench warrant for failure to appear on pending charges of burglary and petit theft.

At 3:10 p.m., Boise City Police Officers arrived at Fee's residence to arrest him on the outstanding bench warrant. As the officers approached, they saw children playing outside Pierce Park Lane, # 10. Upon seeing the approaching police, the children scattered and one of them ran into Fee's residence. After setting up a perimeter around the mobile home, officers stopped a man who was walking away from the rear of the mobile home. He identified himself as Mel Duquette and told the officers that he had just come from Fee's residence, that the residence contained a meth lab, and that Fee was inside "cooking stuff."

The officers knocked on the door, yelling for several minutes, "We're the police," and ordering anyone inside to open the door and come out. Officer Lance Nickerson walked partway around the trailer where, through an open window, he observed a man inside turn, look at him, and walk away. The man, who matched the description of Fee in the Crime Stoppers report, did not respond when Nickerson yelled, "We're the police" and "Open the door." Nickerson said that he caught a whiff of chemical odors through the open window. Nickerson then ran back to the front of the residence, where another officer was unsuccessfully attempting to kick in the door. Nickerson told the officers about the chemical odor, the person inside, what he believed was the sound of clinking metal or glass, and that he thought chemicals were being dumped in the trailer. After more banging on the door, during which someone inside yelled profanities, the man Nickerson had observed through the window opened the door.

The officers grabbed the man, later identified as Fee, pulled him outside and handcuffed him, while Fee yelled, "Stay the f— out of my house." Nickerson noticed that Fee's hands were stained a reddish purple color, indicating to him that Fee might have been using iodine, a chemical Nickerson had seen before in clandestine methamphetamine manufacturing operations. Within ten minutes of Fee's arrest, Nickerson and a few other officers entered the residence for a couple of minutes to conduct a cursory search for anyone remaining inside who might present a danger to the officers, to ventilate the mobile home of potentially dangerous and explosive chemical fumes, and to look for the child seen running into the mobile home. Nickerson was in the residence for one of two minutes, opening windows to vent the fumes, but did not find anyone else inside.

A few minutes after Nickerson exited, people across the street told the officers that the

child was still inside. Officers reentered the residence and found the child hiding under clothing on a bed. The officers were inside the trailer for three to four minutes this second time.

The residence was being ventilated when Sergeant Leroy Graham, a narcotics officer assigned to supervise the clean-up of meth labs, arrived at about 4:00 p.m. Upon arrival, Graham observed Fee seated on the driveway about thirty feet from the residence surrounded by several officers. At Graham's request, an officer asked Fee for consent to search the mobile home and Fee agreed, signing a consent to search form.

Thereafter, an officer trained in the safe clean-up of clandestine drug laboratories entered Fee's residence and recovered pseudoephedrine, red phosphorous, iodine, tincture of iodine, a recipe for making methamphetamine through the ephedrine reduction process, paraphernalia for extracting chemicals and numerous bottles of liquids in separation, representing chemicals that had already been put through the reduction and/or extraction process. Later, at St. Alphonsus Regional Medical Center, a narcotics officer interviewed Fee after *Mirandizing* him. Fee explained that he was cooking methamphetamine for the second time and that he was not very good at it.

Fee was charged with manufacturing a controlled substance, methamphetamine, a felony pursuant to I.C. § 37–2732(a), and manufacturing a controlled substance where a child is present, a felony under I.C. § 37–2737A. Fee filed a motion to suppress the evidence of methamphetamine manufacturing found in his mobile home and his subsequent admission at the hospital. The district court denied Fee's motion to suppress, explaining that the officers' first two entries were justified by exigent circumstances and that the latter entry was based upon Fee's voluntary consent. The court then ruled that Fee's statements at the hospital were admissible based upon a voluntary waiver of his *Miranda* rights.

Pursuant to an I.C.R. 11 plea agreement, Fee pled guilty to manufacturing methamphetamine, specifically reserving the right to appeal the denial of his motion to suppress,

and the remaining charge was dismissed. At sentencing, the district court imposed a fifteen-year term, with five years fixed. Fee appeals.

## II.

## STANDARD OF REVIEW

■ The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson,* 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996).

## III.

## THE WARRANTLESS ENTRY AND SEARCH OF FEE'S RESIDENCE

### A. Standard Applicable To Warrantless Searches On Exigent Circumstances

Fee argues on appeal that the district court erred in denying his motion to suppress because (1) the state failed to establish exigent circumstances justifying the warrantless intrusion into his home, (2) the state failed to show that his consent to the search of his home and a later waiver of his *Miranda* rights were valid and not the result of initial police illegality. The portion of the Fourth Amendment that is pertinent to Fee's claims in this appeal states, "The right of the people to be secure in their ... houses, ... against unreasonable searches and seizures, shall not be violated...." That language, the United States Supreme Court has said, establishes that, "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" stands at "the very core" of the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639, 653 (1980) (quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682–83, 5 L.Ed.2d 734, 739 (1961)), *quoted in State v. Sailas,* 129 Idaho 432, 434, 925 P.2d 1131, 1133 (Ct. App.1996).

■ Any analysis of an officer's warrantless intrusion into a residence begins with recognition that such an entry is presumptively unreasonable and prohibited by the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732, 742 (1984); *State v. Curl*, 125 Idaho 224, 225, 869 P.2d 224, 225 (1993); *State v. Abeyta*, 131 Idaho 704, 707, 963 P.2d 387, 390 (Ct.App.1998). Warrants are not required, however, if a search falls under "a few specifically established and well-delineated exceptions," including exigent circumstances. *Payton*, 445 U.S. at 589–90, 100 S.Ct. at 1381–82, 63 L.Ed.2d at 652–53, *quoted in State v. Salinas*, 134 Idaho 362, 364–65, 2 P.3d 747, 749–50 (Ct.App.2000). The burden is on the government to show the applicability of an exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971); *State v. Johnson*, 110 Idaho 516, 522, 716 P.2d 1288, 1294 (1986). If the government fails to meet its burden, the evidence obtained as a result of the illegal search, including later-discovered evidence derived from the original unlawful search, is inadmissible in court. *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3384, 82 L.Ed.2d 599, 608 (1984); *State v. Bainbridge*, 117 Idaho 245, 249, 787 P.2d 231, 235 (1990).

**B. The First Two Entries Into Fee's Mobile Home Were Justified By Exigent Circumstances**

■ The district court found:

In this case, the officers had probable cause to believe that there was a methamphetamine laboratory in the trailer before they entered, based upon the statements made by Mr. Duquette, the odors coming from the window and the iodine stains on the defendant's hands and wrists. They also had reason to believe that there was a child in the residence. Officer Nickerson

had seen a child enter the trailer as the police arrived at the scene, and the bystanders later yelled that the child was still in the residence. Any child in the residence would have been at risk. The chemicals used to manufacture methamphetamine are hazardous to health, and they sometimes explode or ignite. In fact, a methamphetamine laboratory is typically dismantled by a hazardous materials team, and the chemicals are shipped to a hazardous waste site for disposal. Any child in the residence was at risk of serious injury from breathing the chemical fumes and from the possibility that the chemicals could cause a fire or explosion. Therefore, the two entries into the trailer were justified by exigent circumstances in order to protect or preserve life or avoid serious injury to the child they had probable cause to believe was inside the trailer.

The district court's findings of fact are supported by substantial and competent evidence in the record. The district court's conclusion that these two warrantless entries were justified under the exigent circumstances exception is correct. Prior to entering the house, the officers had probable cause to believe Fee was dismantling a clandestine drug lab based upon the anonymous Crime Stoppers report and the confirming statement of Mel Duquette immediately after leaving the residence, the chemical odors and clanking sounds coming from inside, Fee's procrastination in answering the door, and the stains on Fee's hands.[1] There is substantial and competent evidence that such clandestine drug labs contain hazardous, toxic chemicals that can injure or kill people and cause fire or explosion. The officers' two warrantless intrusions into Fee's residence to ventilate the mobile home of chemical fumes and search for Fee's ten-year-old son who was still inside were justified by exigent circumstances. *Sailas*, 129 Idaho at 434–35, 925 P.2d at 1133–34; *see also State v. Revenaugh*, 133 Idaho 774, 992 P.2d 769 (1999).

---

1. We note that the officers, armed with the felony warrant for Fee's arrest and having received no response to their repeated knocks, identification as police, and commands to open the door, would have been justified in making a forced entry into the residence to arrest Fee. *See State v. Coma*, 133 Idaho 29, 981 P.2d 754 (Ct.App.1999) (Limited authority to enter the home of a suspect where the police reasonably believe him or her to be present applies to misdemeanor as well as felony warrants.). The officers' inability to break in the door before Fee opened it prevented them from doing so.

Accordingly, we affirm the district court's denial of Fee's motion to suppress on this issue.

## C. Consent To Search

Fee argues that his consent to a third warrantless search of his home was not voluntary and was obtained by exploiting prior warrantless searches. Because we have already concluded that the previous two entries were justified under the exigent circumstances exception, we limit review to whether Fee's subsequent consent to search was voluntary.

 Voluntary consent to search from a person who has actual authority to so consent obviates the need for a warrant. *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249 (1974); *State v. Johnson*, 110 Idaho at 522, 716 P.2d at 1294; *State v. Ham*, 113 Idaho 405, 406, 744 P.2d 133, 134 (Ct.App.1987). "The burden is upon the state to show, by a preponderance of the evidence, that a defendant's ... consent to search was given freely and voluntarily.... [T]he voluntariness of a consent to search must be determined from the totality of the circumstances." *State v. Kilby*, 130 Idaho 747, 749, 947 P.2d 420, 422 (Ct.App.1997) (quoting *State v. Aitken*, 121 Idaho 783, 784, 828 P.2d 346, 347 (Ct.App. 1992)). The fact that the defendant is in custody "has never been enough in itself to demonstrate a coerced ... consent to search." *Kilby*, 130 Idaho at 749, 947 P.2d at 422

 The district court found as follows:

When the officers grabbed the Defendant and dragged him out of the trailer to arrest him, the Defendant stated, "Stay the [expletive deleted] out of my house." After the Defendant had been arrested, Sergeant Graham of the Boise Police Department arrived at the scene because of the suspected methamphetamine laboratory. He supervised the people who dismantled those laboratories. After being on the scene for fifteen to thirty minutes, Sergeant Graham asked the Defendant about the chemicals inside the trailer. The Defendant told him to get a warrant. Ser-

geant Graham said, "Fine," and walked away. Officer Nickerson then told Sergeant Graham that Officer Lipple had a very good rapport with the Defendant. Sergeant Graham then apparently asked Officer Lipple to talk to the Defendant, and he did so.

Officer Lipple walked over to the Defendant and asked if he would consent to the search of the trailer. Officer Lipple told the Defendant about the chemical odor they had smelled, the iodine observed on the Defendant's hands, and the statements made by Mr. Duquette. He told the Defendant that if the Defendant would not consent to the search, they would obtain a search warrant. He also told the Defendant that if the Defendant cooperated, Officer Lipple would note such cooperation in his written report and that he felt such cooperation would do the defendant good. The Defendant, who is apparently illiterate, asked what the consent would give the police the authority to do. Officer Lipple told him that it would give them the authority to enter the Defendant's trailer and remove the chemicals. The Defendant then consented to the search of the trailer and signed the written consent form. After the Defendant consented to the search, the officers entered the trailer and removed the various chemicals.

Based upon the totality of the circumstances, the Court finds that the Defendant freely and voluntarily consented to the search of the trailer.... Officer Lipple went to the Defendant and simply told the Defendant what his options were. He could either consent to the search or the police would seek a warrant. He recounted the facts known to the police, from which both Officer Lipple and the Defendant could reasonably believe that the police would be able to obtain a search warrant. The officers did not threaten, mistreat, or intimidate the Defendant, nor did they use any subterfuge to obtain his consent.

The district court's findings of fact regarding Fee's consent are supported by substantial and competent evidence in the record. Lipple told Fee that the officers would obtain

a warrant to search his home or, if Fee were to cooperate, he could sign a consent to search form which would allow the officers to search his home without a warrant. Lipple offered to document Fee's cooperation in his report. Lipple said Fee asked what the form would allow the officers to do and Lipple explained that it would allow the officers to remove the chemicals in his home without a warrant. Another officer on the scene read the consent to search form to Fee after he witnessed Lipple discuss the consent form with Fee. Fee appeared to understand what the consent form would entitle the officers to do and voluntarily signed it. Lipple truthfully informed Fee about the officers' options. Fee presented no evidence to controvert the officers' testimony.

It is beyond cavil that the officers had sufficient facts to establish probable cause for issuance of a search warrant for Pierce Park Lane # 10 in the absence of Fee's voluntary consent. Thus, defendant's consent was not contaminated by a false assertion of legal authority or the right to obtain a search warrant. *See and compare Bumper v. North Carolina*, 391 U.S. 543, 546–50, 88 S.Ct. 1788, 1790–92, 20 L.Ed.2d 797, 801–03 (1968) (coercion present when the officers falsely claimed to have a search warrant) *with United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir.1974) (well-founded advice of law enforcement agent that, absent a consent to search, a search warrant can be obtained does not constitute coercion negativing an otherwise voluntary consent).

Accordingly, we affirm the district court's denial of Fee's motion to suppress for lack of voluntary consent.

**D. Subsequent Waiver Of *Miranda* Rights**

Fee argues that his post-*Miranda* admission to manufacturing methamphetamine was involuntary and based upon prior police illegality. Because we have already concluded that the previous two entries were justified under the exigent circumstances exception, and the latter entry was pursuant to Fee's voluntary consent, we limit review to whether Fee's post-*Miranda* statements were voluntary.

Any waiver of *Miranda* rights or the underlying constitutional privilege against self-incrimination must be made knowingly, voluntarily, and intelligently, and the state bears the burden of demonstrating such. *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct.App.1998); *State v. Alger*, 115 Idaho 42, 45, 764 P.2d 119, 122 (Ct.App. 1988). An appellate review of this waiver issue encompasses the totality of the circumstances. *State v. Dunn*, 134 Idaho 165, 169, 997 P.2d 626, 630 (Ct.App.2000).

The district court concluded that Fee's hospital statements were voluntary, explaining:

There is no evidence that the police used any intimidation, coercion, or deception in an attempt to get the Defendant to waive his *Miranda* rights. There is no evidence that the Defendant was on medication, or in pain, or in any way more susceptible to the request that he waive his *Miranda* rights than he otherwise would have been. The Defendant was not subjected to prolonged interrogation, or even to repeated requests to talk. Officer Turnbough merely informed the Defendant of his *Miranda* rights, asked the Defendant if he understood them, and, upon the Defendant stating that he did, asked the defendant if he would agree to speak. The Defendant answered that he would, and Officer Turnbough then began asking him questions. Obviously, the Defendant's waiver is not coerced merely because he was in custody.... The Court finds, based upon the totality of the circumstances, that the Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights before talking to Officer Turnbough at the hospital.

The district court's findings of fact regarding Fee's voluntary waiver of his *Miranda* rights are supported by substantial and competent evidence in the record. While Fee presented no argument on this issue at the hearing on his motion to suppress, the preliminary hearing transcript, which Fee submitted as evidence, contains the testimony from Officer Turnbough who *Mirandized* and then interviewed Fee. Turnbough testi-

fied that he read to Fee from a written *Miranda* form. Fee indicated that he understood his rights and then agreed to speak with Turnbough. Turnbough then asked Fee about his involvement in the meth lab and Fee said that his girlfriend was not involved, "that he was the one that was cooking the meth and that it was his second time that he'd ever cooked meth and that he was not very good at it." On cross-examination, Turnbough explained that Fee was in custody at the time of the interview and that he read Fee the *Miranda* form because Fee had indicated he was illiterate.

■ From our independent review of the record, Fee's *Miranda* waiver was neither coerced nor otherwise involuntary. Rather, Fee's motive in making a statement to the police was his fear that his girlfriend might be implicated. In order to find a violation of a defendant's due process rights by virtue of an involuntary confession, coercive police conduct is necessary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986); *State v. Johns,* 112 Idaho 873, 736 P.2d 1327 (1987); *State v. Whiteley,* 124 Idaho 261, 268, 858 P.2d 800, 807 (Ct.App.1993). "Not every factor affecting a defendant's decision to confess enters into this analysis. In determining whether a statement is voluntarily made, we will assess only police conduct causally related to the defendant's confession." *State v. Davis,* 115 Idaho 462, 464, 767 P.2d 837, 839 (Ct.App. 1989). Any compulsion Fee felt was attributable to his feelings for his girlfriend, not conduct by the police, and thus Fee's waiver was not involuntary. *See Johns,* 112 Idaho at 878–79, 736 P.2d at 1332–33 (no *Miranda* violation where defendant's independent concern for his girlfriend was the motive for his confession).

Thus, we affirm the district court's denial of Fee's motion to suppress Fee's post-*Miranda* statement for lack of consent.

## IV.

## EXCESSIVE SENTENCE

■ Finally, Fee appeals his sentence as being excessive. Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion. *State v. Hedger,* 115 Idaho 598, 604, 768 P.2d 1331, 1337 (1989). A sentence may constitute a clear abuse of discretion if it is unreasonable upon the facts of the case. *State v. Broadhead,* 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown,* 121 Idaho 385, 825 P.2d 482 (1992).

"[A] term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable.

Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view of the facts, his sentence was excessive in light of the foregoing criteria."

*Broadhead,* 120 Idaho at 145, 814 P.2d at 405, *quoting State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982).

■ Where an appellant asserts that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record and focus upon the nature of the offense and the character of the offender. *State v. Hernandez,* 121 Idaho 114, 118, 822 P.2d 1011, 1015 (Ct.App.1991); *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). With respect to sentences imposed under the Uniform Sentencing Act,

the minimum period [of confinement] generally will be treated as the probable measure of confinement for the purpose of sentence review. By focusing on this period, we do not wholly disregard the aggregate length of the sentence, nor do we suggest that a prisoner will be *entitled* to parole when the minimum period has elapsed; but we do recognize that he will be *eligible* for parole at that time.

*State v. Sanchez*, 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989). Fee's minimum period of confinement is five years. Accordingly, Fee must demonstrate that this five-year period was an abuse of the district court's discretion.

The instant offense was thirty-eight-year-old Fee's fourth felony conviction. Fee's criminal history reflects approximately thirty misdemeanor convictions over twenty years. Fee told the presentence investigator, and the court at sentencing, that the meth lab belonged to an unnamed someone in his home and that he was just trying to clean it up when the police arrived. Fee also told the presentence investigator that he has a "minor" methamphetamine addiction and has been using controlled substances since he was fourteen years old. The presentence investigator recommended a period of incarceration based upon Fee's failure to change his past criminal behavior. The district court concluded that Fee lacked remorse for his involvement in manufacturing methamphetamine, and imposed a term of imprisonment of fifteen years, with five years fixed. We cannot say that the district court abused its discretion in imposing this sentence given Fee's lengthy criminal record and the escalation of his involvement in the drug culture to manufacturing one of the most corrosive substances to afflict our society. The sentence is fully justified on the basis of protection of society, deterrence and punishment.

## V.

### CONCLUSION

The district court's denial of Fee's motion to suppress evidence and his admission to manufacturing methamphetamine is affirmed. Fee's judgment of conviction and sentence of fifteen years imprisonment, with five years fixed, are also affirmed.

Judge LANSING and Judge Pro Tem HART, concur.